1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,

11              Plaintiff,                       No. CIV S-07-2378 GEB EFB

12        vs.

13   MARE ISLAND SALES, LLC, and
     MIKE MANUEL,
14                                               FINDINGS & RECOMMENDATIONS
                Defendants.
15   _____/

16        This case was referred to the undersigned pursuant to Local Rule 72-302(c)(19).  *See* 28

17   U.S.C. § 636(b)(1).  Having considered plaintiff's motion for entry of default judgment, the court

18   issues the following findings and recommends that the motion be granted.

19   **I.  BACKGROUND**

20        This case is proceeding on the complaint filed November 5, 2007.  Plaintiff, the United

21   States, seeks recovery of amounts expended by the United States Coast Guard, National

22   Pollution Funds Center ("NPFC"), in connection with two incidents involving vessels, the M/V

23   Quapaw and the M/V Moctobi, owned and operated by defendants.  Defendants Mike Manuel

24   and Mare Island Sales, LLC (and/or its alter egos) owned, operated and controlled both vessels

25   during the relevant periods alleged in the complaint.  *See* Complaint ("Compl."), ¶¶ 8-27.  Each

26   is the "responsible party" for the vessels within the meaning of that term used in the Oil

1

Pollution Act of 1990, 33 U.S.C. §§ 2701, *et seq*. ("OPA").  Compl., ¶¶ 18, 26.

Plaintiff alleges that on October 13, 2004, personnel from the United States Coast Guard Marine Safety Office ("MSO") investigated a report that the M/V Quapaw was in danger of sinking in the Port of Richmond Harbor with oil on board.  Compl., ¶ 32.  During the inspection, they observed the vessel listing to the starboard side and taking on water, and determined that water on board the vessel had been mixed with oil and other hazardous materials.  *Id*.  Plaintiff alleges that, on the same day, defendants told the MSO that they would prevent the vessel from sinking and discharging oil into the San Francisco Bay, and would start pumping water from the vessel within forty-eight hours.  Compl., ¶ 33.

On October 15, 2004, the United States Coast Guard Federal On Scene Coordinator ("FOSC") determined that the vessel presented an immediate and substantial threat of discharge of oil and hazardous substances, and issued an administrative order pursuant to the Federal Water Pollution Control Act and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq*.  That order directed defendant Mare Island Sales to remove the threat of pollution or prevent the vessel from sinking by October 22, 2004.  Mare Island Sales did not comply with the order and chose instead to appeal it.  Compl., ¶ 35.  Following Mare Island Sales' unsuccessful appeal of that order, FOSC issued a second administrative order requiring it to submit a plan for the abatement and permanent removal of the pollution threat.  Mare Island Sales failed to comply with that order, and MSO retained a third-party contractor to remove approximately 47,000 gallons of oil, oily waste and hazardous substances from the M/V Quapaw.  Compl., at ¶¶ 36-37.

Plaintiff alleges a second, similar incident involving defendants' vessel, the M/V Moctobi.  On June 23, 2006, the MSO observed the vessel taking on water and noted that its bilges were filled with oily water.  Compl., ¶ 43.  On June 26, 2006, the FOSC determined that the vessel presented an immediate and substantial threat of discharging oil and hazardous substances, and ordered Mare Island Sales to begin containment measures by noon the next day.

1    *Id*.  Mare Island Sales did not respond, and MSO retained a third party contractor to pump the oil

2    from the M/V Moctobi.  *Id*., ¶¶ 43-45.  Approximately 100,000 gallons of oily water and 4,900

3    gallons of diesel, oil, and hazardous substances were removed from the vessel.  *Id*., ¶ 46.

4         Plaintiff initiated this action on November 5, 2007, alleging claims against defendants

5    under OPA, CERCLA, the Federal Water Pollution Control Act, and the Federal Debt Collection

6    Procedures Act.  Plaintiff also asserts a seventh cause of action alleging the priority of its claims

7    against defendants pursuant to 31 U.S.C. § 3713.  As specified in its motion for entry of default

8    judgment, plaintiff alleges that defendants are liable under the OPA and the Federal Water

9    Pollution Control Act for all costs and damages incurred by plaintiff in removing the oil

10   discharged from the M/V Quapaw and the M/V Moctobi.

11        Defendants were served with the summons and complaint by substitute service on

12   December 11, 2007.  *See* Declaration of Eric Kaufman-Cohen in Support of Request for Entry of

13   Defaults Against Defendants ("Kaufman Decl."), ¶¶ 10-12; Exh. E thereto.  Defendants failed to

14   file an answer or otherwise respond to the complaint.  The Clerk entered default against each

15   defendant on January 22, 2008.

16        Plaintiff now moves for entry of default judgment pursuant to Fed. R. Civ. P. 55(b)(2).[1]

17   Plaintiff seeks entry of judgment against defendants for a sum certain in the amount of

18   $225,745.73 – "the exact amount incurred by the NPFC in averting the immediate and

19   substantial threat of discharge of oil and other hazardous substances into the navigable waters of

20   the San Francisco Bay from two vessels owned and operated by defendants."  Memo. of Points

21   and Authorities in Support of Motion for Entry of Default Judgment, 5:13-16.  This amount is set

22   forth in affidavits supporting the motion.  *See* In Admiralty Statement of Amount Due (docket

23   nos. 20, 21).  Plaintiff does not seek interest on that amount, nor does it seek attorneys' fees or

24

25        [1] Plaintiff initially moved for entry of default judgment pursuant to Fed. R. Civ. P.
     55(b)(1), on February 11, 2008, for the sums certain identified in affidavits accompanying the
     motion.  The Clerk declined to enter default judgment under that provision, and directed plaintiff
26   to file the present motion pursuant to Fed. R. Civ. P. 55(b)(2).

1  costs related to this litigation.

2  **III.  DISCUSSION**

3          Pursuant to Federal Rule of Civil Procedure 55(a), the Clerk is required to enter default

4  when the fact of default is established by affidavit or otherwise.  Fed. R. Civ. P. 55(a).  In this

5  case, default was established by plaintiff and entered by the Clerk on January 22, 2008.  Now

6  before the court is plaintiff's application for entry of default judgment against defendants

7  pursuant to Fed. R. Civ. P. 55(b)(2).

8          A.      Standard

9          It is within the sound discretion of the district court to grant or deny a default judgment.

10  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  In making this determination, the court

11  considers the following factors:

12                  (1) the possibility of prejudice to the plaintiff, (2) the merits of
                    plaintiff's substantive claim, (3) the sufficiency of the complaint,
13                  (4) the sum of money at stake in the action, (5) the possibility of a
                    dispute concerning the material facts, (6) whether the default was
14                  due to excusable neglect, and (7) the strong policy underlying the
                    Federal Rules of Civil Procedure favoring decisions on the merits.
15

16  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

17          B.      Analysis

18          The first *Eitel* factor weighs in plaintiff's favor. Plaintiff would be prejudiced if default

19  judgment were not granted because it would be denied the right to judicial resolution of the

20  claims presented.

21          The second and third factors also weigh in plaintiffs' favor.  As a general rule, once

22  default is entered, the factual allegations of the complaint are taken as true, except for those

23  allegations relating to the damages.  *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917-18

24  (9th Cir. 1987) (citations omitted).

25          Here, the facts as plead by plaintiff establish that it is entitled to recover the costs for

26  removal of oil spilled from defendants' vessels, the M/V Quapaw and the M/V Moctobi.

Pursuant to 33 U.S.C. § 2702(a), of the OPA, "each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines . . .  is liable for the removal costs and damages specified in subsection (b) that result from such incident."  Subsection (b) provides that the "removal costs referred to in subsection (a) of this section are . . .  all removal costs incurred by the United States . . . under subsection (c), (d), (e), or (1) of section 1321 of this title . . . ."  33 U.S.C. § 2702(b).

Section 1321 refers to the Federal Water Pollution Control Act, 33 U.S.C. §§ 1321(c)-(e). Section 1321(c) directs  the President to "ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance" into navigable waters.  33 U.S.C. § 1321(c)(1)(A).  It also "provides that, in carrying out those duties, the President may: (i) remove or arrange for the removal of a discharge, and mitigate or prevent a substantial threat of a discharge, at any time; (ii) direct or monitor all Federal, State, and private actions to remove a discharge . . . ."  *United States v. Hyundai Merchant Marine Co.*, 172 F.3d 1187, 1189-90 (9th Cir. 1999) (quoting 33 U.S.C. § 1321(c)(1)(B)(i),(ii)).  Subsection (c) further  "provides that, when a discharge or substantial threat of a discharge of oil is of a size or character to be a substantial threat to the health or welfare of the United States (including a threat to fish or wildlife), then:  The President shall direct all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threat of the discharge."  *Id.* (quoting 33 U.S.C. § 1321(c)(2)(A) (1998) (internal quotations omitted)).

These provisions of the OPA and the Federal Water Pollution Control Act, when read together, establish that the United States is entitled to recover the costs incurred by monitoring and removing the leaking vessels that are the subject of this complaint.  *See Hyundai Merchant Marine Co.*, 172 F.3d at 1190.  Plaintiff has plead facts establishing that defendants are the "responsible parties" for the leaking vessels, that these parties failed to cooperate or otherwise

work to prevent the discharge of oil from the vessels, and that the discharge posed a threat of immediate harm.  The court finds that the complaint is sufficiently plead and states a claim under these provisions of OPA and the Federal Water Pollution Control Act, such that plaintiff is entitled to recover the costs established in the affidavits submitted with this motion.  *See* In Admiralty Statement of Amount Due (docket no. 20) (establishing costs in the amount of $76,533.78 in connection with the M/V Quapaw cleanup, sworn to by Robert N. Hildebrand, Project Manager with the NPFC for the case involving that vessel) and (docket no. 21) (establishing costs in the amount of $149,211.95 in connection with the M/V Moctobi cleanup, sworn to by Richard Boes, Project Manager with the NPFC for the case involving that vessel). Thus, the second and third *Eitel* factors weigh in favor of granting default judgment against defendants.

The fourth *Eitel* factor, the sum of money at stake, weighs in plaintiff's favor for the reason that it only seeks to recover the costs in removing the discharge from the subject vessels, and does not seek interest, attorneys' fees or costs associated with the present litigation.  Having established that plaintiff is entitled to relief under the above-cited federal statutes, plaintiff would be prejudiced if judgment were not awarded in its favor.

With regard to the fifth factor, no genuine issue of material fact exists because the allegations in the complaint are taken as true, *TeleVideo Systems*, 826 F.2d at 917-18, and defendants have submitted nothing to contradict them.

The sixth factor also weighs in plaintiff's favor since defendants have failed to make any appearance in this case. Such failure to respond cannot be deemed "excusable neglect."

Finally, only the seventh *Eitel* factor weighs against granting the motion for default judgment.  The strong policy underlying the Federal Rules of Civil Procedure favor decisions on the merits.  *Eitel*, 782 F.2d at 1472.  Nonetheless, where a defendant fails to answer the complaint, a decision on the merits is "impractical, if not impossible." *Elektra Ent. Group, Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005) (citations omitted).  Thus, given defendants'

failure to appear or respond in any way, this factor does not preclude an entry of default judgment. *Id.*, at 393. Thus, on balance, the factors weigh in favor of granting plaintiff's motion for entry of default judgment.

**IV. CONCLUSION**

In accordance with the foregoing, IT IS RECOMMENDED that:

1. Plaintiff's application for entry of default judgment against defendants be granted;

2. Judgment be entered in plaintiff's favor and against defendants Mare Island Sales, LLC and Mike Manuel, jointly and severally, in the amount of $225,745.73; and,

3. The Clerk be directed to close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within ten (10) days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten (10) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED:  September 16, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE